# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| Oklahoma Department of Securities<br>*ex rel.* Melanie Hall, Administrator, | ) | |
| | ) | |
| Plaintiff, | ) | **FILED IN DISTRICT COURT**<br>**OKLAHOMA COUNTY** |
| v. | ) | |
| | ) | MAR 1 5 2024 |
| Premier Global Corporation, a Kansas corporation, | ) | RICK WARREN<br>COURT CLERK |
| formerly known as Premier Construction Services, | ) | 125 |
| Inc., and doing business as Premier Construction | ) | |
| Billing; | ) | |
| Premier Factoring, LLC, a Kansas limited | ) | |
| liability company; | ) | |
| PF-2, LLC, a Kansas limited liability company; | ) | |
| PF-3, LLC, a Kansas limited liability company; | ) | |
| PF-4, LLC, a Kansas limited liability company; | ) | |
| PF-5, LLC, a Kansas limited liability company; | ) | |
| PF-6, LLC, a Kansas limited liability company; | ) | Case No. CJ-2022-5066 |
| PF-7, LLC, a Kansas limited liability company; | ) | |
| DDI Advisory Group, LLC, a Kansas limited | ) | |
| liability company; | ) | |
| Steve Jonathan Parish, an individual; | ) | |
| Richard Dale Dean, an individual; | ) | |
| Premier Marketing Management, | ) | |
| a Kansas corporation; | ) | |
| Joshua Dane Owen, an individual; | ) | |
| J&H Holdings, LLC, a cancelled Oklahoma | ) | |
| limited liability company; | ) | |
| Kyle Blackburn, an individual; | ) | |
| Mitzimack, Inc., an Oklahoma corporation; | ) | |
| Erika Greggs, an individual; | ) | |
| Elkins & Associates Inc., an Oklahoma corporation;) | | |
| Clyde Edward Elkins, an individual; | ) | |
| James Scott Stanley, an individual; | ) | |
| Edmond Brokerage, Inc., an Oklahoma corporation;) | | |
| Brent Lee Worley, an individual; | ) | |
| Byron Kent Freeman, an individual; | ) | |
| Karen Lynne Freeman, an individual; and | ) | |
| Jay Michael Bogdahn, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED PETITION FOR PERMANENT INJUNCTION AND OTHER RELIEF

**EXHIBIT**

**1**

Plaintiff, Oklahoma Department of Securities *ex rel.* Melanie Hall, Administrator, having been granted leave of Court to file an amended petition pursuant to 12 Okla. Stat. Ann. § 2015(A), for its claims against the above-named Defendants, alleges and states as follows:

### THE PREMIER STORY

1.      Since at least 2018, Defendants Steve Jonathan Parish and Richard Dale Dean have designed and orchestrated a massive Ponzi scheme through multiple entities under their control (collectively, the "Premier Defendants"). [1]

2.      At all times material hereto, the Premier Defendants have been involved in the offer and sale of securities to investors in the form of promissory notes and transferee agreements, while representing to investors and others that Defendant Premier Global Corporation is successfully engaged in the business of factoring construction related invoices. Offering documents provided to investors disclose that investor money will be used to purchase construction related invoices for factoring purposes.  Investors are promised interest payments in return.

3.      At all times material hereto, securities have been sold to investors in at least nineteen states, including Oklahoma.  There are at least 136 Oklahoma investors.

4.      Defendants induce investors with promised interest rates of ten percent (10%) for promissory notes and rates of return of up to fifteen percent (15%) for transferee agreements. Contrary to the disclosures in the offering documents, the Premier Defendants have not always used factoring revenues to pay investors their promised interest or the return

---

[1] The Premier Defendants include Steve Jonathan Parish; Richard Dale Dean; Premier Global Corporation; Premier Factoring LLC; PF-2, LLC; PF-3, LLC; PF-4, LLC; PF-5, LLC; PF-6, LLC; PF-7, LLC; DDI Advisory Group, LLC; Premier Marketing Management; and Joshua Dane Owen.

of their principal investment amounts. In practice, the Premier Defendants have primarily generated returns for earlier investors with money taken from later investors, the definition of a classic Ponzi scheme.

5. As will be further discussed below, the Premier Defendants have misappropriated millions of dollars of investor funds in additional undisclosed ways to include the following:

(a) to make hundreds of millions of dollars in intra-company transfers;

(b) to pay commissions to agents selling the securities on behalf of the Premier Defendants even though the Premier Defendants represented that sales commissions would not be paid;

(c) to pay expenses unrelated to the factoring business such as real estate ventures in Belize and Las Vegas that in no way benefited investors; and

(d) to pay expenses for the personal benefit of the individual Premier Defendants and their family members for acquisitions of houses, condominiums, and airplanes.

6. During the time period beginning in January 2018 and ending in November 2022, approximately Five Hundred Thirty-Five Million Dollars ($535,000,000) of investor money was deposited in at least twenty-one (21) accounts maintained in at least five banks. During the same time period, Premier Defendants, had no more than Ninety-Five Million Dollars ($95,000,000) of other monies deposited to those accounts that could possibly be attributed to invoice factoring revenue. During the same time period, purported returns paid to investors exceeded Four Hundred Twenty-Eight Million Dollars ($428,000,000). As evidenced by the chart below, only 15% of the money obtained by the Premier Defendants

during the relevant time period is from potential factoring activity. The only conclusion is that the source of funding for expenditures made to investors as investment returns could only be other investors' money – a true Ponzi scheme.

| Premier Account Analysis Summary | | |
|---|---|---|
| | Jan 2018 - Nov 2022 | |
| **Intra-Company/Entity Transfers** | | |
| Intra-Company/Entity Transfers In | 905,319,994.02 | |
| Intra-Company/Entity Transfers Out | (900,121,043.68) | |
| | | |
| **All Other Transactions** | Total | % of Total |
| Deposits | | |
| Potential Business | 94,790,862.93 | 15% |
| Investors | 535,306,841.75 | 85% |
| Salespeople | 1,084,041.97 | 0% |
| *Total All Other Deposits* | 631,181,746.65 | 100% |
| | | |
| Expenditures | | |
| Potential Business | (197,896,643.18) | 31% |
| Investors | (428,897,771.85) | 67% |
| Salespeople | (10,292,529.51) | 2% |
| *Total All Other Expenditures* | (637,086,944.54) | 100% |

7.     As more fully set forth below, Plaintiff alleges that Defendants have engaged in the offer and sale of unregistered securities in violation of Section 1-301 of the Oklahoma Uniform Securities Act of 2004 ("Act"), Okla. Stat. tit. 71, §§ 1-101 through 1-701 (2023); have acted as unregistered agents in violation of Section 1-402 of the Act; have employed numerous unregistered agents in violation of Section 1-402 of the Act; have committed fraud in connection with the offer, sale and/or purchase of securities in violation of Section 1-501 of the Act; have made materially false or misleading filings and/or have made material omissions in violation of Section 1-505 of the Act; and in addition, or in the alternative, Defendants Dean,

4

DDI Advisory, and the Oklahoma Sales Agents (defined herein below), materially aided Defendants Parish, Premier, and the PF Entities (each defined herein below) in violating Section 1-501 of the Act. Unless enjoined and restrained, Defendants will continue violating the Act.

## PENDING LITIGATION

8.      Since August 2020, Plaintiff has sought Oklahoma County District Court relief in order to obtain subpoenaed documents from Defendants Premier; Premier Factoring Group, LLC; Premier Factoring, LLC; PF-2, LLC; PF-3, LLC; PF-4, LLC; PF-5, LLC; PF-6, LLC; and PF-7, LLC, in the nature of invoice factoring documentation (*Oklahoma Department of Securities ex rel. Melanie Hall v. Premier Global Corporation, et. al.*, Case No. CJ-2021-4397). In October 2021, Plaintiff filed an application for an order enforcing administrative subpoenas after these Defendants failed to produce subpoenaed invoice factoring records. Such records were sought by Plaintiff to verify revenue figures used by Defendants to solicit investors. Due to the findings by the District Court that the subpoena production was deficient and noncompliant, the District Court enjoined the Defendants from the offer, sale, or renewal of any securities in and/or from Oklahoma. The injunction remains in place.

## JURISDICTION

9.      Plaintiff brings this action pursuant to Section 1-603 of the Act and is the proper party to bring this action against Defendants.

10.      Pursuant to Sections 1-102 and 1-610 of the Act, Defendants, in connection with their activities in the offer and/or sale of securities in and/or from this state, are subject to the provisions of the Act. By virtue of their activities in this state, as described herein,

5

Defendants are subject to the jurisdiction of this Court and to service of summons within and outside of this state.

11.    Venue is proper in this county.

## DEFENDANTS

## PREMIER

12.    Premier Global Corporation ("Premier"), formerly known as Premier Construction Services, Inc. ("PCS"), is a Kansas corporation with its principal place of business in Derby, Kansas. Premier continues to use the PCS name and also conducts business as Premier Construction Billing. At no time have any securities issued, offered and/or sold by Premier been registered, or qualified for an exemption from registration, under the Act. At all times material hereto, Premier was controlled by Steve Jonathan Parish.

13.    Premier Factoring, LLC; PF-2, LLC; PF-3, LLC; PF-4, LLC; PF-5, LLC; PF-6, LLC; and PF-7, LLC (collectively, the "PF Entities") are Kansas limited liability companies with their principal places of business in Derby, Kansas. According to offering documents provided to investors, the PF Entities were formed to engage in the business of factoring primarily construction related invoices. At no time have any securities issued by the PF Entities been registered, or qualified for an exemption from registration, under the Act. At all times material hereto, Premier and DDI Advisory Group, LLC, were the limited liability company members of the PF Entities. The managers of the PF Entities were Steve Jonathan Parish and Richard Dale Dean.

14.    DDI Advisory Group, LLC ("DDI Advisory") is a Kansas limited liability company with its principal place of business in Plano, Texas. At all times material hereto, DDI

6

Advisory was controlled by Richard Dale Dean. At all times material hereto, DDI has not been registered, or exempt from registration, under the Act in any capacity.

15. Steve Jonathan Parish ("Parish") is an individual who, at all times material hereto, has been a resident of Kansas and has controlled Premier and the PF Entities. Parish has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Parish has not been registered in any capacity under the Act.

16. Richard Dale "Dickie" Dean ("Dean") is an individual who, at all times material hereto, has been a resident of Texas and has controlled DDI Advisory and the PF Entities. Dean has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Dean has not been registered in any capacity under the Act.

17. Premier Marketing Management, Inc. ("Premier Marketing"), is a Kansas corporation with its principal place of business in Derby, Kansas. At all times material hereto, Premier Marketing has been controlled by Joshua Dane Owen. At all times material hereto, Premier Marketing has not been registered, or exempt from registration, under the Act in any capacity.

18. Joshua Dane Owen ("Owen") is an individual who, at all times material hereto, has been a resident of Kansas. Owen has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Owen has not been registered in any capacity under the Act.

## OKLAHOMA SALES AGENTS

19. J&H Holdings, LLC ("J&H") is a cancelled Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma. At all times

7

material hereto, J&H has been controlled by Defendant Kyle Blackburn. At no time has J&H been registered, or exempt from registration, under the Act in any capacity.

20.    Kyle Blackburn ("Blackburn"), an individual, is an Oklahoma resident. Blackburn has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Blackburn was not registered in any capacity under the Act. Blackburn is the brother of Erika Greggs.

21.    Mitzimack Inc. ("Mitzimack") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. At all times material hereto, Mitzimack has been controlled by Erika Greggs. At no time has Mitzimack been registered, or exempt from registration, under the Act in any capacity.

22.    Erika Greggs ("Greggs"), an individual, is an Oklahoma resident. Greggs has offered and sold securities in and/or from Oklahoma as described herein. At all times material hereto, Greggs was not registered in any capacity under the Act. Greggs is the sister of Blackburn.

23.    Elkins & Associates Inc. ("Elkins & Associates") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. At all times material hereto, Elkins & Associates has been controlled by Clyde Edward "Eddie" Elkins. At all times material hereto, Elkins & Associates was not registered, or exempt from registration, under the Act in any capacity.

24.    Clyde Edward "Eddie" Elkins ("Elkins"), an individual, is an Oklahoma resident. Elkins has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Elkins was not registered in any capacity under the Act.

8

25.    James Scott Stanley ("Stanley"), an individual, is an Oklahoma resident. Stanley has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Stanley was not registered in any capacity under the Act.

26.    Edmond Brokerage, Inc. ("Edmond Brokerage") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. At all times material hereto, Edmond Brokerage has been controlled by Brent Lee Worley. At all times material hereto, Edmond Brokerage has not been registered, or exempt from registration, under the Act in any capacity.

27.    Brent Lee Worley ("Worley"), an individual, is an Oklahoma resident. Worley has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Worley was not registered in any capacity under the Act.

28.    Byron Kent Freeman ("Kent Freeman"), an individual, is an Oklahoma resident. Kent Freeman has offered and/or sold securities in and/or from Oklahoma as described herein. Kent Freeman was registered under the Act as an investment adviser representative between July of 2008 and November of 2020. Kent Freeman is married to Karen Freeman.

29.    Karen Lynne Freeman ("Karen Freeman"), an individual, is an Oklahoma resident. Karen Freeman has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Karen Freeman was not registered in any capacity under the Act. Karen Freeman was registered as a broker-dealer agent under the Act from April of 1994 to June of 2000. Karen Freeman is married to Kent Freeman.

30.     Jay Michael Bogdahn ("Bogdahn"), an individual, is an Oklahoma resident. Bogdahn has offered and/or sold securities in and/or from Oklahoma as described herein. At all times material hereto, Bogdahn was not registered in any capacity under the Act.

## CERTAIN DEFENDANTS' DISCIPLINARY HISTORIES

### ELKINS

31.     Defendant Elkins was the subject of two previous civil actions brought by Plaintiff in Oklahoma County District Court, Case No. CJ-2004-6295 (the "2004 Action") and Case No. CJ-2007-2415 (the "2007 Action"). In the 2004 Action, the Court issued an order prohibiting Elkins from offering or selling any security, and from acting as a broker-dealer or agent, in and/or from Oklahoma (the "2004 Order"). Elkins had sold unregistered securities in the nature of death benefits in viatical settlement contracts; promissory notes; and stock.

32.     In 2007, Plaintiff discovered that Elkins was continuing to offer and sell unregistered securities in violation of the Act and the 2004 Order. The securities sold by Elkins were in the nature of interests in mineral claims and right of first refusal contracts. As a result, Plaintiff filed the 2007 Action for contempt against Elkins.

33.     On August 3, 2007, the District Court entered a permanent injunction against Elkins forever enjoining and restraining him from offering and/or selling any security in and/or from the state of Oklahoma unless (a) Elkins became registered as a securities agent under the Act and (b) the security, if not exempt, was registered under the Act (the "2007 Order"). Elkins entered a plea of guilty for violating the 2004 Order and was ordered to disgorge his profits from the sale of the securities to investors. He received a deferred sentence.

34.     Elkins violated the terms of the 2007 Order by failing to disgorge his profits to investors. In February 2008, Plaintiff filed an application to accelerate the deferred sentence.

10

35.     On April 16, 2008, the Court entered an *Order Accelerating Deferred Sentence* against Elkins. Elkins was fined and sentenced to six months in jail.

## STANLEY

36.     Defendant Stanley was registered as a broker-dealer agent under the Act from January of 1989 to May of 2008.

37.     Stanley was also a defendant in the 2004 Action brought against Elkins. Plaintiff alleged that Stanley offered and/or sold unregistered securities in and/or from the state of Oklahoma in the nature of promissory notes and interests in viatical settlement contracts; acted as an agent without benefit of registration; and engaged in fraud. Stanley sold the securities without the approval of the broker-dealer with whom he was affiliated.

38.     Stanley entered into an agreement with Plaintiff wherein he agreed to comply with the Act and the Rules of the Oklahoma Securities Commission and the Administrator of the Department of Securities and agreed not to offer and/or sell any security in and/or from the state of Oklahoma unless the security was registered under the Act or otherwise qualified for an exemption from registration under the Act. Additional restrictions were imposed on Stanley required that his broker-dealer approve any products he sells, that he sell products only through a broker-dealer, and that a broker-dealer monitor his securities activity.

39.     In 2009, Plaintiff investigated the activities of Stanley after an examination of his broker-dealer revealed that Stanley had again done business that was not authorized by the broker-dealer and engaged in email correspondence that had not been forwarded to the broker-dealer for review and approval as required. Stanley's broker dealer firm permitted him to resign from the firm.

11

40.    On August 12, 2009, Plaintiff filed an Enforcement Division Recommendation against Stanley alleging that, after previously being disciplined for similar activity, Stanley engaged in selling products outside of his broker-dealer, engaged in email correspondence that had not been forwarded to his broker-dealer for review and approval, and failed to follow the written supervisory procedures of his broker-dealer by using his personal email address for business purposes. Plaintiff recommended that Stanley be barred from registration under the Act. Stanley terminated his registration with Plaintiff in late 2009.

41.    In February 2010, Stanley entered a second agreement with Plaintiff, wherein he agreed that for a period of six (6) months, he would not offer and/or sell any security in and/or from the state of Oklahoma or transact business in and/or from the state of Oklahoma as a broker-dealer, broker-dealer agent, issuer agent, investment adviser, and/or investment adviser representative. Further, Stanley agreed that any future registration under the Act would be conditioned on a Plaintiff approved heightened supervision plan by any broker-dealer and/or investment adviser with whom he became associated. Stanley agreed to pay a monetary penalty in the amount of Five Thousand Dollars ($5,000) before he could again be registered under the Act.

42.    Stanley has not applied for registration to offer and/or sell securities since the 2009 termination of his registration.

### KENT FREEMAN

43.    Defendant Kent Freeman was registered as a broker-dealer agent under the Act from September of 1994 to August of 2006.

44.    In 2006, Kent Freeman was terminated as an agent of his broker-dealer firm, after he accepted monies from an outside entity in connection with reports generated on behalf of a client.

45.    Kent Freeman became a registered investment adviser representative under the Act in July of 2008 and remained registered until November 2020, when he was terminated by his investment adviser firm for violation of firm policies regarding participation in unapproved private securities transactions.

## DEAN

46.    In January 2020, Defendant Dean was the subject of an order from the Office of the Kansas Securities Commissioner for the sales of unregistered securities in a nationwide Ponzi scheme involving Woodbridge Mortgage Investment Funds. The securities were issued by a web of limited liability companies to purportedly raise funds for loans to third party borrowers. The securities, in the nature of promissory notes and membership units, were sold to investors through a network of unregistered sales agents, including Dean. Sales agents were paid commissions for the sales of the securities. Dean signed a Consent Oder that concluded he offered and sold unregistered securities and transacted business as an unregistered agent in violation of Kansas law. In August 2020, Dean made a six-figure settlement payment to the trustee of the Woodbridge Liquidation Trust to settle claims asserted against him for the sale of unregistered securities and for securities fraud in an adversary complaint filed as part of the Woodbridge bankruptcy case in the United States Bankruptcy Court for the District of Delaware.

## NATURE OF THE CASE

## CONSTRUCTION BILLING AND INVOICE FACTORING

13

47. According to offering documents provided to investors, Defendant Premier evolved over time from a construction contractor into a provider of construction billing services on behalf of contractor and subcontractor clients. According to those same offering documents, Premier began factoring invoices for its contractor and subcontractor clients in order to provide such clients with "cash flow for their outstanding invoices for construction services and materials provided to construction projects."

48. According to its own documents, Premier simply provides a billing service that, for a fee, generates an invoice on behalf of a client and sends it to the party for whom construction work was performed. To provide such clients with cash flow, Premier pays the clients a percentage of the amount of the invoice(s). At no point does Premier require, nor does the construction client execute, any master factoring contract, assignment, pledge, or other commercially recognized instrument relating to an invoice in favor of Premier. Premier does not make any type of filing to perfect such an interest under the Uniform Commercial Code.

49. To finance the invoice factoring that is to be made to its contractor and subcontractor clients, Premier and DDI Advisory raised money from investors through the offer, sale and issuance of promissory notes and transferee agreements.

## THE PROMISSORY NOTES

50. In or about 2017, Defendants Premier and DDI Advisory began to form the PF Entities as a series of essentially identical limited liability companies that would each issue promissory notes to investors (collectively, the "Promissory Notes"). Identical private placement memoranda ("PPMs") for each PF Entity were prepared and distributed in connection with the offer and/or sale of the Promissory Notes to investors. Defendants, except Owen and Premier Marketing, represent that the Promissory Notes will pay the investors a

14

stated annual return of ten percent (10%) for a one (1) year term that is automatically renewable unless prior notice is given within 90 days. An indemnity certificate, included in the PPMs, provides assurances that funding will be in place in the event of any default on the payment of an invoice. All such offerings by the PF Entities are for the stated purpose of factoring invoices.

51.     Each PPM states that the PF Entity will raise Ten Million Dollars ($10,000,000) from only accredited investors. The PPMs also disclose that the Premier Defendants are relying on an exemption from securities registration requirements. The designated exemption provides that each offering is part of a single issue to be sold to no more than twenty-five (25) investors, that no general solicitation or general advertising will be used, and that no commissions or any remuneration will be paid to any salesperson. All of the required elements to claim the exemption have not been satisfied by any of the PF Entities.

52.     The PPMs provide background information concerning Defendants Premier and DDI Advisory as well as biographical information about Defendants Parish and Dean. The PPMs also contain representations about how investment money will be used and how investor money will be secured through each PF Entity's purchase of invoices.

53.     The biographical information contained in the PPMs states that Parish "formed Premier Global Corporation and has transformed it into a business with a focus on providing desperately needed cash flow to subcontractors in the industry. Under Steve's guidance as CEO, Premier has grown to nearly $200,000,000 in total annual revenue in just 10 years." The PPMs represent that Premier's revenue increased from Eighty Million Dollars ($80,000,000) in 2018 to Two Hundred Million Dollars ($200,000,000) by 2020. No financial statements, either audited or unaudited, or other financial information, are provided to investors in any of the PPMs or otherwise.

54.    The Promissory Notes were offered and sold to investors, using the above-described PPMs, through numerous unregistered sales agents in numerous states, including a large number of agents in the state of Oklahoma. Before being ordered to stop by the Oklahoma County District Court in July 2022, the Promissory Notes were offered and sold in and/or from Oklahoma primarily through Defendants J&H, Blackburn, Mitzimack, Greggs, Elkins & Associates, Elkins, Stanley, Edmond Brokerage, Worley, Kent Freeman, Karen Freeman, and Bogdahn (collectively, the "Oklahoma Sales Agents").

55.    The commission for the sales agents was three percent (3%) of the principal amount of the Promissory Note investment. In addition, Blackburn received a one-half percent (.5%) override on all Oklahoma Sales Agent Promissory Note sales. Commission payments were paid by the applicable PF Entity on a monthly basis starting immediately after a Promissory Note was sold. Commission payments ended if the investors asked for the return of their money from Premier. In addition, commission payments increased if the investor renewed the investment or invested additional funds.

56.    The PPMs for each PF Entity falsely state: "The securities in this offering are sold directly through issuance by the Company, as issuer. No commission will be paid on such sales."

57.    The Oklahoma Sales Agents sold Promissory Notes between 2017 and 2022 that resulted in the payment, at a minimum, of the following commissions:

| Agent | Total Commissions Paid |
|-------|------------------------|
| J&H/Blackburn | $1,045,518.93 |
| Mitzimack/Greggs | $568,353.08 |
| Elkins & Associates/Elkins | $195,064.11 |
| Edmond Brokerage/Worley | $327,521.98 |
| Stanley | $232,499.50 |
| Karen Freeman | $1,059,684.38 |
| Bogdahn | $56,893.86 |

16

58.     Defendants Dean and DDI Advisory, collectively, received payments from Premier and the PF Entities totaling $4,267,051.80 relative to Promissory Notes sold to investors.

## THE TRANSFEREE AGREEMENTS

59.     In addition to the Promissory Notes issued by each PF Entity, Defendants Premier, Premier Marketing, Parish, and Owen raised money from investors (collectively, the "Transferee Investors") through the offer and sale of transferee agreements (collectively, the "Transferee Agreements"). As with the Promissory Notes, the Transferee Agreements are tied to the invoice factoring of Premier. Premier, Premier Marketing, Parish, and Owen sold the Transferee Agreements to at least two Oklahoma Transferee Investors promising the Transferee Investors a return on their investments of fifteen percent (15%).

60.     The Transferee Agreements are executed by each Transferee Investor and a representative of Premier, for a one (1) year term that is automatically renewable unless prior notice is given within 90 days. The Transferee Agreements require that the Transferee Investor open an account, dedicated solely for the execution of the transactions subject to the Transferee Agreement, at a bank designated by Premier. Transferee Investors deposit funds into the account to purchase the rights to collect upon Premier's receipt of the amount owed on the invoice by Premier's billing service customer. A Premier representative is added as a signatory on the account to allow Premier, Premier Marketing, Parish, and Owen to "…conduct, monitor, and review the account transactions as they are processed." All efforts necessary for the Transferee Investor to realize a profitable return are performed by Premier, Premier Marketing, Parish, and Owen.

61.    Transferee Investors receive monthly business activity reports that purport to show the invoice purchases from their accounts and any repayment on the invoices back to the accounts. Owen controls the purchase of the invoices for each Transferee Investor account and makes entries to the monthly business activity reports.

62.    According to an October 1, 2022, Transferee Investor business activity report, none of the invoices purportedly purchased by Premier on behalf of such investors had been partially or fully paid since December 2021.

63.    Premier, Premier Marketing, Parish, and Owen sold Transferee Agreements from as early as 2011 through 2022 that resulted in the payment of commissions and/or other remuneration to Premier Marketing, Owen and other agents.

### THE FRAUDULENT CONDUCT

#### A.    REVENUE MISREPRESENTATIONS

64.    At every point in connection with the offer and sale of both the Promissory Notes and Transferee Agreements to investors, Defendants represent that Premier is a very profitable business. However, at all times material hereto, the payments from Premier to the Promissory Note and the Transferee Investors, along with its payment of sales commissions to sales agents, greatly exceeded any possible business revenue from invoice factoring activity. One of the most fundamental and material representations made by Defendants to investors is false.

#### B.    INVOICE OWNERSHIP MISREPRESENTATIONS

65.    Although Defendants Parish and Dean established each PF Entity as a separate limited liability company and represented to Promissory Note Investors that each PF Entity would "purchase" and/or "acquire" its own factored invoice assets, such segregation was

18

illusory. Each PPM repeatedly represents to Promissory Note Investors that the "Company", defined in each PPM as the specific PF Entity, will "acquire" or "purchase" factored invoices. For example, page 7 of the PPM for PF-2, LLC, dated August 14, 2018, states under the heading "Factoring of Invoices", that the Company has been formed to engage in the "purchase of invoices from various construction companies". Representations that the PF Entity is acquiring or owning invoices are made throughout the PPMs without qualification. Each PPM even emphasizes to potential investors that the PF Entity will essentially have no "assets" other than factored invoices purchased with PF Entity Investors' funds. Such representations are false. In reality, no PF Entity "acquires" or "purchases" factored invoices in any commercially recognized manner.

66.     Although initially deposited into a bank account held by and in the name of the specific PF Entity, Promissory Note Investors' money was quickly transferred to one of five entirely separate financial institutions. The accounts were held by Premier and were used by the Premier Defendants for a myriad of purposes as discussed in paragraph 5 above.

67.     The factored invoices were initially paid for, and subsequently payments are collected by, Premier. Premier merely created an internal invoice tracking number that corresponds to a specific PF entity. This internal bookkeeping function did not affect a transfer of ownership of the invoice to the PF Entity.

68.     In short, contrary to the representations in the PPMs, the bookkeeping entry results in each PF Entity being nothing more than a potential creditor holding a claim to a factored invoice.  At no point does a PF Entity have any commercially cognizable claim that would equate to "ownership" of an invoice. As a result, the numerous representations in the

PPMs of "acquiring" or "purchasing" an invoice as an asset of each PF Entity are materially false.

C.    **OKLAHOMA SALES AGENT MISREPRESENTATIONS/OMISSIONS**

69.    The Promissory Notes were offered and sold to Oklahoma investors through the unregistered Oklahoma Sales Agents. As part of the scheme to evade the securities registration requirements of the Act, Defendants Parish and Dean created and implemented a "Contractor Services Agreement" process between DDI Advisory and the Oklahoma Sales Agents and referred to the commission payments as "loan servicing fees" rather than commissions.

70.    In many instances, Oklahoma investors were not provided with the PPMs until after their investment decisions were made and their money was submitted to the PF Entities.

71.    Kent Freeman and Karen Freeman conspired to work together on the sales of the Promissory Notes to hide Kent Freeman's involvement from his associated investment adviser. While Kent Freeman offered and sold the securities, Karen Freeman executed all "Contractor Services Agreements", nominally signed sales documents as the "Contractor", and directly received the commission payments for each sale. Oklahoma investors did not know Karen Freeman was associated in any way with their purchases of their investments. Karen Freeman's only real concern during the process was whether the commissions had been promptly deposited into her bank account.

72.    Defendants, excluding Owen and Premier Marketing, did not disclose to Oklahoma investors the disciplinary history of Dean, *i.e.*, involving his participation in a large Ponzi scheme prior to offering and selling the Promissory Notes on behalf of Premier.

73.    Defendants Elkins, Kent Freeman, and Stanley did not disclose to investors their disciplinary histories prior to offering and selling the Promissory Notes on behalf of Premier.

74.    To avoid the detection of selling securities outside of his associated investment adviser, known as "selling away", Defendant Kent Freeman conspired with Defendant Karen Freeman to offer and sell the Promissory Notes to Oklahoma investors utilizing the scheme described in paragraph 70 above.

75.    Despite the PPMs stating that the offerings are to be made only to "accredited investors", Oklahoma investors were allowed to invest with the PF Entities when they did not qualify as "accredited investors". In at least one instance, Defendants Kent Freeman and Worley falsified documents to make it appear as though an investor qualified as an "accredited investor" when the investor did not.

### D.    EXEMPT OFFERING MISREPRESENTATIONS

76.    Contrary to representations made to investors, Promissory Notes failed to qualify for an exemption from the securities registration requirements under the Act.

77.    Contrary to representations made to investors, Transferee Agreements failed to qualify for an exemption from the securities registration requirements under the Act.

### E.    UNDISCLOSED TRANSFERS OF SUBSTANTIAL INVESTOR FUNDS

78.    From January 2018 through 2022, Premier engaged in extensive activity involving the transfer of funds among at least twenty-one (21) bank accounts at least at five (5) banks. The transfer of money, including millions of dollars entrusted to it from Promissory Note and Transferee Investors, soared to the sum of approximately Nine Hundred Million Dollars ($900,000,000) in deposits and approximately Nine Hundred Million Dollars

($900,000000) in expenditures. Defendants never disclosed to Promissory Note or Transferee Investors that their money would be used for extensive intra-company transfers for activity that was not attributable to actual invoice factoring.

### F.    INVESTOR MONEY USED TO PAY OTHER INVESTORS

79.    To keep the scheme from collapsing and to prevent its detection, Premier Defendants used money received from new investors to pay promised returns to prior Promissory Note and Transferee Investors.

### G.    TRANSFEREE REPORT MISREPRESENTATIONS

80.    To conceal the misuse of Transferee Investor funds and to perpetuate the scheme to defraud the investors, Defendants Premier, Premier Marketing, Parish, and Owen provided monthly business activity reports to the Transferee Investors, falsely describing the revenue being generated from factoring activity.

### H.    SUBMISSION OF FABRICATED INVOICES

81.    After extensive litigation and court orders that certain invoice documents be produced to Plaintiff, Defendants Premier and the PF Entities produced a limited and inadequate number of records to the Court and to the Plaintiff. Defendant Parish submitted a *Declaration of Completeness of Document Production* under penalty of perjury. The Court found the documents to be deficient and noncompliant. The documents were revealed by Plaintiff, through a financial analysis of the records and from an affidavit from a Kansas law enforcement officer, to be largely fabricated.

**I.    DEFAULT JUDGMENT AGAINST PARISH, PREMIER, AND PF ENTITIES**

82.    On February 23, 2023, this Court entered default judgment in favor of Plaintiff against Defendants Parish, Premier, and the PF Entities, on the issue of liability as to each and every cause of action in Plaintiff's original Petition, all involving violations of the Act.

## FIRST CAUSE OF ACTION

**(Violation of Section 1-301 of the Act:
Offer and/or Sale of Unregistered Securities)**

83.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 82 above.

84.    The Promissory Notes and Transferee Agreements are securities, as defined by Section 1-102 of the Act.

85.    Defendants offered and sold securities in and/or from Oklahoma.

86.    The Promissory Notes and Transferee Agreements are not and have not been registered under the Act nor were these securities offered or sold pursuant to an exemption from registration, as required by Section 1-301 of the Act.

87.    By reason of the foregoing, Defendants have violated, are violating, and unless enjoined, will continue to violate Section 1-301 of the Act.

## SECOND CAUSE OF ACTION

**(Violation of Section 1-402 of the Act:
Offers and Sales of Securities by Unregistered Agents and
Employing Unregistered Agents)**

88.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding cause of action.

89.    Premier and the PF Entities are issuers, as defined in Section 1-102 of the Act.

90.    Defendants offered and sold unregistered securities in and/or from Oklahoma.

23

91.   Dean, Owen, and the Oklahoma Sales Agents are not, and have not been, registered as agents pursuant to Section 1-402 of the Act and, therefore, acted as unregistered agents in the offer and sale of the Promissory Notes (Dean and the Oklahoma Sales Agents) and Transferee Agreements (Owen).

92.   One or more of the Premier Defendants employed Dean, Owen, and the Oklahoma Sales Agents to offer and/or sell securities in this state, who were unregistered agents.

93.   By reason of the foregoing, the Premier Defendants and the Oklahoma Sales Agents, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-402 of the Act.

### THIRD CAUSE OF ACTION

**(Violation of Section 1-501(2) of the Act: Making an Untrue
Statement of Material Fact or Omitting to State a Material Fact)**

94.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

95.   Defendants, in connection with the offer and/or sale of securities, through the statements described above, have made, and continue to make, untrue statements of material fact or omitted, and continue to omit, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as more specifically described above in the Fraudulent Conduct section of this First Amended Petition, subparagraphs A. through G.

96.   By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-501(2) of the Act.

24

97.    In addition, or in the alternative, by reason of the foregoing, Defendants Dean, DDI Advisory, and each of the Oklahoma Sales Agents, materially aided Parish, Premier, and the PF Entities in violating Section 1-501(2) of the Act relative to the offer and sale of Promissory Notes for which Parish, Premier, and the PF Entities have been adjudged liable.

98.    In addition, or in the alternative, Defendants Owen and Premier Marketing, materially aided Parish and Premier in violating Section 1-501(2) of the Act relative to the offer and sale of the Transferee Agreements for which Parish and Premier have been adjudged liable.

## FOURTH CAUSE OF ACTION

### (Violation of Section 1-501(3) of the Act:  Engaging in any Act, Practice, or Course of Business that Operates or Would Operate as a Fraud or Deceit upon Another Person)

99.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

100.    Defendants, in connection with the offer and/or sale of securities, through the acts, practices and course of business described above, have engaged, and are engaging, in acts, practices, and a course of business that operate as a fraud upon investors.

101.    By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-501(3) of the Act.

102.    In addition, or in the alternative, by reason of the foregoing, Defendants Dean, DDI Advisory, and each of the Oklahoma Sales Agents, materially aided Parish, Premier, and the PF Entities in violating Section 1-501(3) of the Act relative to the offer and sale of the Promissory Notes for which Parish, Premier, and the PF Entities have been adjudged liable.

103.    In addition, or in the alternative, by reason of the foregoing, Defendants Owen and Premier Marketing, materially aided Parish and Premier in violating Section 1-501(3) of the Act relative to the offer and sale of the Transferee Agreements for which Parish and Premier have been adjudged liable.

## FIFTH CAUSE OF ACTION

### (Violation of Section 1-505 of the Act:  Misleading Filings)

104.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

105.    Defendants Premier and the PF Entities have been found liable for making or causing to be made, in records used in an action or proceeding and filed under the Act, statements that, at the time and in the light of the circumstances under which they were made, were materially false or misleading, or, omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not false or misleading.

106.    By reason of the foregoing, Defendants Premier and the Premier Entities, have been adjudged liable for violating Section 1-505 of the Act.

107.    In addition, as a controlling person and entity of each of the PF Entities, Defendants Dean and DDI Advisory materially aided Premier and the PF Entities in violating Section 1-505 of the Act.

## PRAYER FOR RELIEF

Defendants have engaged and are engaging in acts and practices in violation of the Act and, as a result of these activities, have received a substantial amount of money from investors.

WHEREFORE, based upon the foregoing, and pursuant to the authority specifically granted by Section 1-603 of the Act, Plaintiff prays for the Court to grant the following relief:

I.

A permanent injunction enjoining Defendants from transacting business in and/or from the state of Oklahoma as an issuer, issuer agent, broker-dealer, broker-dealer agent, investment adviser, and/or investment adviser representative and from otherwise offering and/or selling securities in and/or from the state of Oklahoma;

II.

An order prohibiting Defendants, their agents, servants employees, assigns and all those persons, directly or in directly, acting on their behalf, under their direction and control, and/or in active concert of participation with them, who receive actual notice of the order, by personal service, facsimile or otherwise, and each of them from tampering with, mutilating, altering, erasing, concealing, removing, destroying or otherwise disposing of any and all books, records, documents, files, correspondence, computer disks, tapes or other data recordings of any type, pertaining to or referring to Defendants and any of their subsidiaries or affiliates;

III.

An order prohibiting Defendants, their agents, servants, employees, assigns and all those persons, directly or indirectly, acting on their behalf, under their direction and control, and/or in active concert or participation with them, who receive actual notice of the order, by personal service, facsimile or otherwise, and each of them from, directly or indirectly, transferring, withdrawing, concealing, removing, destroying, or otherwise disposing of any and all assets of the Premier Defendants.

27

IV.

Restitution to be paid by Defendants to Oklahoma Promissory Note Investors and Transferee Investors;

V.

Disgorgement of all ill-gotten gains obtained by Defendants as a result of their violations of the Act;

VI.

A civil penalty in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) against each Defendant; and/or

VII.

Such other relief, including equitable remedies and ancillary relief, as the Court may deem necessary, just, and proper in connection with the enforcement of the Act.

Respectfully submitted,

OKLAHOMA DEPARTMENT OF SECURITIES
MELANIE HALL, ADMINISTRATOR

By: _____
Patricia A. Labarthe, OBA No. 10391
Shaun M. Mullins, OBA No. 16869
Bradley E. Davenport, OBA No. 18687
Oklahoma Department of Securities
204 North Robinson, Suite 400
Oklahoma City, Oklahoma 73102
Telephone (405) 280-7700
Fax (405) 280-7742
Email: plabarthe@securities.ok.gov
        smullins@securities.ok.gov
        bdavenport@securities.ok.gov

28

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of __March__, 2024, a true and correct copy of the above and foregoing *First Amended Petition for Permanent Injunction and Other Relief* was delivered via First Class U.S. mail, with postage fully prepaid thereon, to:

Rollin Nash, Jr.
Dennis S. Boxeur
Bryan C. Dixon
NASH COHENOUR & GIESSMAN, P.C.
4101 Perimeter Center Dr., Ste. 200
Oklahoma City, OK 73112
Email: dboxuer@nashfirm.com
        bdixon@nashfirm.com
*Attorneys for Defendants Elkins & Assoc., Inc.*
*and Clyde Edward Elkins*

Jeanette C. Timmons
CONNER & WINTERS, LP
1700 One Leadership Square
211 N. Robinson Ave.
Oklahoma City, OK 73102
Email: jtimmons@cwlaw.com
*Attorney for Defendants J & H Holdings, LLC,*
*Kyle Blackburn, Mitzimack, Inc., Erika*
*Greggs, James Scott Stanley, Edmond*
*Brokerage, Inc., Brent Lee Worley, Byron Kent*
*Freeman, Karen Lynne Freeman, and*
*Jay Michael Bogdahn*

J. Clay Christensen
Jonathon M. Miles
Brock Z. Pittman
Whitney J. Dockrey
CHRISTENSEN LAW GROUP, P.L.L.C.
The Parkway Bldg.
3401 N.W. 63rd St., Ste. 600
Oklahoma City, OK 73116
Email: clay@christensenlawgroup.com
        jon@christensenlawgroup.com
        brock@christensenlawgroup.com
        whitney@christensenlawgroup.com
*Attorneys for Defendants J & H Holdings,*
*LLC, Kyle Blackburn, Mitzimack, Inc., Erika*
*Greggs, James Scott Stanley, Edmond*

Justin Williams
OVERMAN LEGAL GROUP, P.L.L.C
809 N.W. 36th St.
Oklahoma City, OK 73118
*Attorney for Defendants Joshua Dane Owen*
*and Premier Marketing Management*

Tara A. LaClair
Mary H. Tolbert
Aimee Majoue
STEPTOE & JOHNSON, PLLC
101 N. Robinson Ave., Ste. 500
Oklahoma City, OK 73102
Email: tara.laclair@steptoe-johnson.com
        molly.tolbert@steptoe-johnson.com
        aimee.majoue@steptoe-johnson.com
*Attorneys for Defendants DDI Advisory*
*Group and Richard Dale Dean*

Eric Johnson, Receiver
SPENCER FANE, LLP
1000 Walnut, Ste. 1400
Kansas City, MO 64106

29

*Brokerage, Inc., Brent Lee Worley, Byron Kent
Freeman, Karen Lynne Freeman, and
Jay Michael Bogdahn*

Hilary Allen
SPENCER FANE, LLP
9400 N. Broadway Ext., Ste. 600
Oklahoma City, OK 73114
Email: hallen@spencerfane.com
*Attorney for Receiver,*
*Eric Johnson*

Shawn D. Twing
Attorney at Law
5005 Lexington Square
Amarillo, TX 79109
*Attorney for interested party,*
*Life Investors Management Company, LLC*

Bradley E. Davenport

30