FILED IN DISTRICT COURT
OKLAHOMA COUNTY

DEC 1 9 2025

RICK WARREN
COURT CLERK
BB

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| Oklahoma Department of Securities *ex rel.* Melanie Hall, Administrator, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Freeman Financial Group, LLC, and Byron Kent Freeman, | ) | Case No. |
| | ) | |
| Defendants, | ) | **CJ - 2025 - 9 4 0 5** |
| | ) | |
| and | ) | |
| | ) | |
| Karen Lynne Freeman, | ) | |
| | ) | |
| Relief Defendant. | ) | |

## PETITION FOR PERMANENT INJUNCTION AND OTHER RELIEF

Plaintiff, Oklahoma Department of Securities *ex rel.* Melanie Hall, Administrator, ("Plaintiff") for the claims against the above-named Defendants and Relief Defendant, alleges and states as follows:

### OVERVIEW

1.　This case involves numerous violations of the Oklahoma Uniform Securities Act of 2004 ("Act") and the Rules of the Oklahoma Securities Commission and the Administrator of the Department of Securities ("Rules") by Byron Kent Freeman ("Kent Freeman"), who at times material hereto, was registered under the Act as an agent and/or investment adviser representative, and the company he controlled, Freeman Financial Group, LLC, ("Freeman Financial") (collectively "Defendants"), and Karen Lynne Freeman ("Karen Freeman" or "Relief Defendant").

1

EXHIBIT
2

2.     As more fully described below, Plaintiff alleges that Defendants have offered and sold unregistered securities to numerous clients, in violation of Section 1-301 of the Act, and committed fraud, through various misrepresentations and omissions, in connection with the offer and sale of those unregistered securities, in violation of Section 1-501 of the Act.

3. While registered under the Act as an investment adviser representative, Kent Freeman breached his fiduciary duty to his clients and engaged in dishonest and unethical practices in his investment advisory business, in violation of 660:11-7-42 of the Rules.

4. Finally, in an effort to deceive his clients and hide his violations of the Act from Plaintiff, Kent Freeman falsified required investment adviser registration forms filed under the Act and lied under oath about his activities when questioned by Department staff, all in violation of Section 1-505 of the Act.

5.     As described below, Kent Freeman became increasingly indebted to his clients, either directly by borrowing money from them, or through investments he sold them whereby he promised to personally pay premiums required to keep those investments in effect. With insufficient income to cover monthly interest payments to clients and promised premium obligations, Kent Freeman borrowed increasing amounts of money from clients and used these funds to make Ponzi scheme type interest payments to prior investors, to maintain his lifestyle, and to pay a litany of personal expenses ranging from massive credit card bills, travel, medical, lawn care, and even veterinary and pet burial expenses.

6.     Kent Freeman was able to perpetuate these schemes based on the trust and confidence placed in him by his clients through decades of receiving investment advisory and insurance services from him. Kent Freeman preyed on his customers regardless of age. Many

of the clients whom he defrauded were retired; several were sixty (60), seventy (70) and eighty (80) years of age; and one was nearly 90.

## JURISDICTION

7.     Plaintiff brings this action pursuant to Section 1-603 of the Act and is the proper party to bring this action against Defendants and Relief Defendant.

8.     Pursuant to Sections 1-102 and 1-610 of the Act, Defendants and Relief Defendant, in connection with their activities in the offer and/or sale of securities in and/or from this state, are subject to the provisions of the Act. By virtue of their activities in this state, as described herein, Defendants and Relief Defendant are subject to the jurisdiction of this Court and to service of summons within and outside of this state.  In connection with his registration under the Act as an investment adviser representative, Kent Freeman affirmatively consented to the jurisdiction of this Court as specified in paragraphs 6 and 7 of his Form U-4 (Uniform Application for Securities Industry Registration or Transfer).

9.     Venue is proper in this county.

## DEFENDANTS

10.     Freeman Financial Group, LLC, is an Oklahoma limited liability company, that, at all times material hereto, maintained its principal place of business in either Oklahoma City, Oklahoma, or Edmond, Oklahoma, and was controlled by Kent Freeman.

11.     Kent Freeman, a resident of Oklahoma County, maintained registration under the Act as either an agent or investment adviser representative for 30 years.  During that time, he has taken and passed the Series 6 (Investment Company and Variable Contracts Products Representative) examination, Series 63 (Uniform Securities Agent State Law) examination, and Series 65 (Uniform Investment Adviser Law) examination.  During such time, Kent

3

Freeman attended numerous compliance and ethics training sessions and seminars and signed written contracts with investment advisory firms that emphasized the importance of compliance with all state and federal laws and regulations pertaining to engaging in the business of providing investment advisory services and adherence to the policies and procedures of the investment advisory firm with whom he is or was affiliated.

12.    Kent Freeman offered and sold securities in and/or from Oklahoma as described herein. Given his decades of experience, Kent Freeman was fully aware that he was required to comply with the Act, the Rules applicable to investment adviser representatives and the policies and procedures of his affiliated investment advisory firm. He was also aware that he had a fiduciary duty to act in the best interests of his clients at all times, not his own. As described below, Kent Freeman violated that duty repeatedly.

**RELIEF DEFENDANT**

13.    Karen Freeman is a resident of Oklahoma County. At all times material hereto, Karen Freeman was not registered in any capacity under the Act. Karen Freeman was registered as a broker-dealer agent under the Act from April of 1994 to June of 2000. Karen Freeman is currently, and was at all times material hereto, married to Kent Freeman. Given her background and lengthy experience as an agent registered under the Act, Karen Freeman was aware of the existence of the Act, its requirements of registration as an agent under the Act, and the prohibitions against engaging in dishonest and unethical practices in the securities business. As described below and as part of the scheme to hide their illegal activity, large sums of investor money, paid directly to Defendants or as unlawful sales commissions, were transferred to or received directly by Karen Freeman.

## LIFE SETTLEMENT INTERESTS

14.     Beginning in or about 2013, Kent Freeman offered and sold to his investment advisory, insurance and other clients, what he termed "life settlements." He described the investment as buying an interest in the life insurance policy of another person. He represented that investor money would be used to purchase a life insurance policy from an insured at an amount less than the death benefit amount of the policy. He advised each investor of the remaining life expectancy of the insured or provided the client with a written life expectancy evaluation performed by a third party. He then explained that rates of return to each investor over time would depend upon how long the insured continued to live. The shorter the life expectancy of the insured, the greater the potential rate of return to the investor and vice versa. To continue the effectiveness of each "life settlement" investment, payment of the annual premium charged by the insurance company for the life insurance policy was required. When the death benefit amount was paid by the life insurer upon the death of the insured, such proceeds would be distributed to investors based upon the percentage(s) of the policy purchased by each investor.

15.     Kent Freeman offered and sold his clients two similarly structured types of "life settlement" investments that differed only by whom was responsible for payment of annual premiums necessary to keep the life insurance policies in effect. Regardless of the type of "life settlement" investment purchased, what investors actually received were membership interests (the "Life Settlement LLC Interest(s)") in manager-managed limited liability companies (the "Life Settlement LLCs") that either directly owned an entire life insurance policy or group of policies or that held a pro-rata interest in another manager-managed limited liability company that directly owned a life insurance policy. The life insurance policies were pre-selected and

5

all administrative functions necessary to maintain the effectiveness of the policy and/or to receive and distribute any proceeds were performed by the manager(s) of the limited liability companies.

16.     Both types of "life settlement" investments involved the investment of money by the client, in a common enterprise, with profitability derived primarily from the efforts of the limited liability company managers, not the investors.  As such, the Life Settlement LLC Interests are securities, as defined by the Act.

## A.     The Direct Life Settlement Interests

17.     With regard to the first type of Life Settlement LLC Interests, each investor/member was individually required to pay, as an annual capital contribution to the limited liability company, a pro-rata portion of the annual premium necessary to keep the life insurance policy in effect (referred to herein as the "Direct Life Settlement Interests").

18.     In connection with the offer and sale of the Direct Life Settlement Interests, Kent Freeman presented investors with a "Confidential Private Placement Memorandum" ("PPM") describing the particular offering.  The PPM relating to each Direct Life Settlement Interest described the investment as a "Limited Investor Membership" unit in a limited liability company (described in each PPM as "the Company"), formed to directly own and hold a life insurance policy or to invest a specific amount of money in another limited liability company (defined in each PPM as the "Insurance Partnership") that used investor money, along with funds from other similarly created entities, to "acquire, and pay premiums sufficient to maintain, a policy of life insurance" on the life of a named individual.

6

19.     The operating agreement associated with each Direct Life Settlement Interest provided that the business and internal affairs of each Company would be reserved to the pre-appointed managers of the Company specifically designated in the operating agreement (the "Managers"). The Managers were authorized in the operating agreement to appoint and retain pre-designated administrators (the "Administrators") responsible for functions necessary to administer each Life Settlement LLC.

20.     All decisions pertaining to each Life Settlement LLC were pre-determined prior to the offer and sale of the investment by Kent Freeman, including, the exact life insurance policy acquired, the manager and/or administrator of each Life Settlement LLC, and the purchase price of each Direct Life Settlement Interest.

21.     Since 2013, Kent Freeman has offered and sold in excess of Three Hundred Thousand Dollars ($300,000) worth of Direct Life Settlement Interests to his investment advisory, insurance, and other clients.

22.     During this time period, Kent Freeman failed to disclose this business activity to any broker-dealer or investment advisory ("IA") firm with whom he was affiliated.

23.     None of the Direct Life Settlement Interests offered and sold by Kent Freeman were registered as securities at any time under the Act.

B.     The Ten Percent Life Settlement Interests

24.     As investors began to express concerns about the requirement of having to personally pay annual, and often increasing, premium obligations, Kent Freeman offered and sold a second type of Life Settlement LLC Interest for which he represented that he would be solely responsible for payment of all annual premiums necessary to keep the life insurance

policies in effect. Kent Freeman also promised investors that in addition to their pro-rata portion of the death benefit, they would be paid ten percent (10%) interest compounded annually on the amount of their initial investment from the date of such investment until the death of the insured (referred to below as the "Ten Percent Life Settlement Interests").

25.     The Ten Percent Life Settlement Interests also involved the purchase of a membership interest unit in a limited liability company formed for the specific purpose of directly owning or investing a specified amount of money in another limited liability company (also defined as the "Insurance Partnership") that would then use investor money, along with funds from other similarly created entities, to "acquire, and pay premiums sufficient to maintain, a policy of life insurance" on the life of a named individual (also referred to as the "Insured Member"). Kent Freeman's clients understood that he would pay all necessary policy premiums.

26.     Kent Freeman provided his clients with a PPM and an operating agreement for each Ten Percent Life Settlement Interest that were substantially similar to those provided in connection with the Direct Life Settlement Interests but contained the additional representations regarding the obligation of Kent Freeman to pay required premiums and the promised ten percent interest. The operating agreement for each limited liability company, however, stated that it is the limited liability company in which the investor purchases a membership interest that has the obligation to pay the investor ten percent interest, compounded annually, upon the death of the Insured Member of the Insurance Partnership, *not* Kent Freeman.

27.     Like the Direct Life Settlement Interests, the operating agreements associated with each Ten Percent Life Settlement Interest provided that the business and internal affairs

of each such company would be reserved to the pre-appointed managers of the company, specifically designated in the operating agreement (the "Managers"). The Managers were authorized in the operating agreement to appoint and retain pre-designated administrators (the "Administrators") responsible for functions necessary to administer each Life Settlement LLC.

28. Likewise, all decisions pertaining to: a) which life insurance policy was purchased or which Insurance Partnership each Life Settlement LLC would invest in; b) who managed each Life Settlement LLC; c) who acted as Administrators of each Life Settlement LLC; d) the purchase price of each Ten Percent Life Settlement Interest; and e) the percentage interest each Life Settlement LLC held in the Insurance Partnership, were determined prior to the offer and sale of the Ten Percent Life Settlement Interests.

29. In connection with the offer and sale of the Ten Percent Life Settlement Interests, the PPMs, operating agreements and other documents omitted to state:

a. whether Kent Freeman had the ability to pay the required annual premium obligations;

b. that Kent Freeman had identical annual premium payment obligations with respect to numerous other Ten Percent Life Settlement Interest investors in at least five (5) other Life Settlement LLCs, and how the total of such annual obligations affected his ability to meet all required obligations to his investors;

c. that Kent Freeman had insufficient income to cover his Ten Percent Life Settlement Interest annual premium obligations, so that he was dependent upon borrowing increasing amounts of money from clients to cover increasing debt

obligations to clients from whom he had previously borrowed money (scheme described below);

d.     that he was required to disclose this outside business activity in writing to, and receive approval from, the investment adviser with whom he was registered and had not done so; and,

e.     that the annually compounded ten percent (10%) principal and interest amounts owed by each Life Settlement LLC to investors exceeded the value of each LLC's net death benefit interest should the insured individual(s) live more than a few years beyond the life expectancy projection provided to investors.

30.     During this time period, Kent Freeman failed to disclose this business activity to any broker-dealer or investment advisory ("IA") firm with whom he was affiliated.

31.     Since 2013, Kent Freeman has offered and sold in excess of One Million Dollars ($1,000,000) worth of the Ten Percent Life Settlement Interests to his investment advisory, insurance, and other clients.

32.     None of the Ten Percent Life Settlement Interests offered and sold by Kent Freeman were registered as securities at any time under the Act.

### FACTORING PROMISSORY NOTES

33.     In 2018, Kent Freeman began offering and selling unregistered securities to his clients in the form of promissory notes related to a purported construction factoring business based in Derby, Kansas (the "Premier Promissory Notes"). The Premier Promissory Notes were issued by a series of virtually identical limited liability companies (the "Factoring Entities") formed by Premier Global Corporation, controlled by Steve Jonathan Parish

10

("Parish"), a resident of Derby, Kansas; and DDI Advisory Group, LLC, controlled by Richard Dale Dean ("Dean"), a resident of Plano, Texas.

34.     Virtually identical offering documents, each entitled "Confidential Private Placement Memorandum" (the "Premier PPMs"), were prepared and distributed to investors in connection with the offering of the Premier Promissory Notes by each Factoring Entity. The PPMs described each Factoring Entity as being engaged in the business of purchasing factored invoices issued primarily by construction related businesses. The Premier PPMs represented that investors would receive Ten Percent (10%) interest on the principal amount of their investment and that their money would be used to purchase factored invoices. The Premier PPMs also represented that Premier Global Corporation was a successful invoice factoring business with "annual revenue" of between 80 and 200 million dollars.

35.     These representations in the Premier PPMs were false. Premier Global Corporation was not a successful invoice factoring business; it was a Ponzi scheme. The scheme was supported by a network of sales agents, like Kent Freeman, who sold the Premier Promissory Notes to their clients.

36.     In reality, actual revenue from invoice factoring was negligible and was vastly less than the 80 to 200 million dollars as represented in the Premier PPMs, and wholly insufficient to cover the 10% interest payments to investors. The scheme was only supported by constant and increasingly large inflows of money from new investors.

37.     The representations in the Premier PPMs, that investor money would be used to purchase and own factored invoices, were also false. The vast majority of investor money was used to pay interest to previous investors and commissions to sales agents selling the Premier Promissory Notes to investors. Furthermore, the small number of factored invoices

11

actually purchased by Premier Global Corporation were not transferred or assigned to each Factoring Entity in any commercially recognized manner that would evidence ownership of, or an interest in, any specific factored invoice. As investor money was received from the sale of the Premier Promissory Notes by each Factoring Entity, the funds were quickly transferred to a bank account of Premier Global Corporation with no contract in place controlling the use or repayment of such money. As a result, each Factoring Entity and its investors were nothing more than unsecured creditors of Premier Global Corporation.

38.    Each sales agent recruited to sell Premier Promissory Notes to their clients was required to sign a contract with each Factoring Entity (the "Contractor Services Agreement"). Knowing he would likely be unable to obtain the required prior written authorization of the investment adviser with whom he was registered to sell the Premier Promissory Notes to his clients, Kent Freeman devised a scheme to hide the sales by having his wife, Relief Defendant Karen Freeman, sign each required Contractor Services Agreement, directing that all sales commissions be paid to her and in her name.

39.    From December 2019, until October, 2022, Kent Freeman, directly or indirectly, sold in excess of Twenty Four Million Dollars ($24,000,000) in principal amount of the Premier Promissory Notes to his clients. None of those clients spoke to, consulted with, or otherwise received any advice from Karen Freeman regarding the purchase of the Premier Promissory Notes.

40.    Karen Freeman was paid One Million Fifty-Nine Thousand Six Hundred Eighty- Four Dollars ($1,059,684) in sales commissions relating to those sales and pursuant to the Contractor Services Agreements she signed.

41.    The Premier Promissory Notes are securities as defined in the Act.

42.    None of the Premier Promissory Notes offered and sold by Kent Freeman were registered as securities at any time under the Act.

## OUTSIDE BUSINESS ACTIVITY

**A.    Failure to Disclose Sales of the Direct Life Settlement Interests and Ten Percent Life Settlement Interests**

43.    To register under the Act as an investment adviser representative, an individual must complete a Uniform Application for Securities Industry Registration or Transfer, also known as a Form U-4. Section 13 of Form U-4 entitled "Other Business" asks the applicant whether they are currently engaged in any business other than providing investment advisory services through the registered investment adviser identified on the Form U-4. If the answer to that question is "yes", the applicant is required to identify and describe the nature of the other business activity; the applicant's position, title and relationship to the business activity; and the amount of time devoted to the activity during securities trading hours.

44.    In response to Section 13 of the U-4 filed by Kent Freeman on April 16, 2019, he answered "yes" and provided the following description: "Independent Insurance Agent Freeman Financial Group 14003B Quail Springs Parkway Oklahoma City, OK 73134 Insurance Sales-Fixed Products—98% of the time." Question 13 and his answer are below:

---

13. Other Business

Are you currently engaged in any other business either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise? (Please exclude non investment-related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.) If YES, please provide the following details: the name of the other business, whether the business is investment-related, the address of the other business, the nature of the other business, your position, title, or relationship with the other business, the start date of your relationship, the approximate number of hours/month you devote to the other business, the number of hours you devote to the other business during securities trading hours, and briefly describe your duties relating to the other business.

C Yes C No

If 'Yes', please enter details below.
INDEPENDENT INSURANCE AGENT FREEMAN FINANCIAL GROUP 14003B QUAIL SPRINGS PARKWAY OKLAHOMA CITY, OK 73134 INSURANCE SALES-FIXED PRODUCTS--98% OF THE TIME

---

13

45.    Kent Freeman failed to disclose his "Other Business" involving the offers and sales of either the Direct Life Settlement Interests or the Ten Percent Life Settlement Interests or his involvement in those entities as an originator or member of the limited liability companies and knowingly falsified answers contained in his filed U-4.

46.    Section 15 of Form U-4 entitled "Signatures" requires the applicant to affirm that all answers provided on the form are true and complete. Section 15 of Form U-4 also requires that the applicant update the form by filing an amendment whenever changes occur to previously provided answers, including Section 13. Kent Freeman filed no amendments to his U-4 disclosing offers or sales of the Direct Life Settlement Interests or the Ten Percent Life Settlement Interests or his involvement in those entities as an originator or member of any Life Settlement LLC.

**B.    Failure to Disclose the Sale of Promissory Notes**

47.    In 2018, Defendants began to offer and sell unregistered securities in the nature of promissory notes to clients as part of a multi-million dollar fraudulent Ponzi scheme originating in Kansas and devised a scheme to hide the sales from regulators by directing that his sales commission payments be paid to, and in the name of, Karen Freeman. As more fully described in *Oklahoma Department of Securities ex rel. Melanie Hall, Administrator vs. Premier Global Corp. et al.*, Case No. CJ-2022-5066 (Dist. Ct. of Oklahoma County)(referenced hereafter as "*the Premier Global Case*"), Defendants offered and sold millions of dollars worth of the unregistered promissory notes to clients.

48.    As alleged in the *Premier Global Case*, Parish and Dean established and controlled the Factoring Entities. Each Factoring Entity issued investors the Premier Promissory Notes. The Premier Promissory Notes were offered and sold to investors in

numerous states using sales agents recruited by Dean, including Kent Freeman, who were primarily licensed to sell insurance (insurance agents), not securities.

49.    Kent Freeman became a registered investment adviser representative under the Act in July of 2008 and remained registered as such until November of 2020. Kent Freeman offered and sold the Premier Promissory Notes while registered.

50.    Rather than disclose this "Other Business" to his affiliated investment adviser on his Form U-4, Kent and Karen Freeman hid Kent Freeman's sales of the Premier Promissory Notes from his associated investment adviser by placing Karen Freeman's name on all contracts required by Dean (the "Contractor Services Agreements") authorizing sales agents to offer and sell the Premier Promissory Notes to their clients. The result of having Karen Freeman execute the Contractor Services Agreements authorizing her to sell the Premier Promissory Notes was that all sales commission payments were directed to and paid in the name of Karen Freeman, rather than Kent Freeman.

51.    None of the Oklahoma investors whom the staff of the Department interviewed identified Karen Freeman as the person who offered or sold them the Premier Promissory Notes or associated her in any way with their investment decision. They identified only Kent Freeman as the person who offered and sold them the Premier Promissory Notes and stated they had no contact with Karen Freeman.

52.    The Premier Promissory Notes are securities as defined in the Act.

53.    None of the Premier Promissory Notes offered and sold by Kent Freeman were registered as securities at any time under the Act.

15

54.    At no point did Kent Freeman disclose his sales of the Premier Promissory Notes on a Form U-4, or any amendment thereto, filed under the Act.

55.    At no point did Kent Freeman disclose, in writing, this outside business activity to any broker-dealer or investment advisory ("IA") firm with whom he was affiliated.

## BORROWING MONEY FROM CLIENTS

56.    The Act and Rules prohibited Kent Freeman from borrowing money from his clients. He intentionally ignored that prohibition. Part 7 of the Rules entitled "RECORD KEEPING AND ETHICAL STANDARDS" sets forth the record keeping and ethical standards applicable to Investment Advisers and Investment Adviser Representatives". 660:11-7-42(b) of the Rules provides in relevant part:

> "(b) Standards. Investment advisers and investment adviser representatives shall act in accordance with their fiduciary duty to their clients and shall *not engage in dishonest or unethical practices including, although not limited to, the following*:
>
> &ast; &ast; &ast;
>
> (6) *Borrowing money or securities from a client* unless the client is a broker-dealer, an affiliate of the investment adviser or investment adviser representative, or a financial institution engaged in the business of loaning funds." [Emphasis added.]

57.    Despite decades of registration under the Act as an agent and/or investment adviser representative, and years of industry experience and compliance training that made clear he was prohibited from borrowing money from clients, Kent Freeman borrowed money from clients, of all ages, over an extended period of time, failed to repay such borrowings, and as described below, has now filed bankruptcy.

16

58.    For example, on February 6, 2019, Kent Freeman signed an "Investment Advisory Representative Contract" ("IAC") with a Florida based investment adviser to become an investment adviser representative of the firm.    In Paragraph 8 of the IAC, Freeman specifically warrants and agrees "not to borrow money or securities from anyone who is a customer of" the investment adviser.

59.    In addition and on that same day, February 6, 2019, Freeman signed a series of attestations (the "IAC Attestations") as part of his IAC wherein he acknowledged that he was aware of and understood certain rules and policies of the IA.    He was required in the IAC Attestations to initial each page confirming his understandings of each rule and/or policy. Item 23 of the IAC Attestations stated in relevant part:    "At no time are you permitted to loan to, borrow money from or co-invest with a client without written approval from an officer of the firm."    Kent Freeman initialed the bottom of the page.

60.    Six months after signing the IAC and the IAC Attestations, Freeman borrowed Four Hundred Thousand Dollars ($400,000.00) from investment advisory client W.W.    On August 7, 2019, Freeman executed a promissory note evidencing the obligation to client W.W. The promissory note carried a seven (7) year term and required a single balloon payment in the amount of $779,486.80 on August 7, 2026.    At the time Freeman borrowed the money, client W.W. was 74 years old, had been recently widowed, and had been retired for many years. Investor W.W. and other of his family members had been investment advisory clients of Kent Freeman for many years.

## FALSE STATEMENTS UNDER OATH TO THE DEPARTMENT

61.　In a continuing effort to hide his ongoing and numerous violations of the Act and the Rules, Defendant Kent Freeman lied under oath to staff of the Department when questioned about his activities.

62.　Section 1-505 of the Act provides as follows:

> **"It is unlawful for a person to make or cause to be made, in a record that is used in an action or proceeding or filed under this act, a statement that, at the time and in the light of the circumstances under which it is made, is false or misleading in a material respect, or, in connection with the statement, to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it was made, not false or misleading."**

63.　On July 1, 2021, a subpoena was issued by Plaintiff to Kent Freemen requiring the production of certain specified records and his appearance for testimony under oath.

64.　On August 16, 2021, Kent Freeman produced records pursuant to the subpoena. He appeared for testimony under oath on September 1, 2021. Kent Freeman was sworn in and a copy of the subpoena was marked as Exhibit "1" and he was asked to identify it. He affirmed that he had received the subpoena and that he had produced all records relating thereto. Item #2 of the subpoena required the production of all records relating to any "investment" offered and/or sold by him and such term was defined within the subpoena to specifically include any "promissory note or note". Nowhere in his response did he produce records pertaining to the borrowing of money from his clients or the promissory notes executed by him to his clients.

65.　In addition, and while still under oath, Kent Freeman was specifically asked whether he had borrowed money from any client. As shown in the excerpt of testimony transcript below, he replied without qualification "No". See below,

18



66.     At the time he provided this false statement under oath, Kent Freeman was paying investment advisory and insurance clients from whom he had borrowed money in excess of Seven Thousand Dollars ($7,000) per month in interest payments alone.

67.     In November 2020, Kent Freeman was terminated by his investment adviser firm for violation of firm policies regarding participation in unapproved private securities transactions.

## DEFENDANT KENT FREEMAN'S FRAUDULENT SCHEME

68.     In addition to the litany of violations of the Act described above, Defendant Kent Freeman engaged in yet another scheme and course of business that operated as a fraud upon his clients costing them hundreds of thousands of dollars of retirement savings.

A.    The Fraudulent "Limited Investor Contracts"

69.    As he became increasingly indebted to his clients, personally responsible for premium obligations for the Ten Percent Life Settlement Interests, to maintain his lifestyle, and pay credit card, tax and other obligations, in 2019, Kent Freeman began to solicit large amounts of money from clients through the use of yet another type of investment contract and debt instrument he created called a "Limited Investor Contract".

70.    Kent Freeman created the Limited Investor Contracts using language and terminology deceptively similar to the language and terminology associated with the Ten Percent Life Settlement Interests wherein investors received a membership interest in an existing limited liability company that held ownership of a life insurance policy.  Despite language identical to that used in documents associated with the Ten Percent Life Settlement Interests, the Limited Investor Contracts created by Kent Freeman were actually nothing more than an unsecured debt obligation of Kent Freeman, individually, not an ownership interest in a company that held ownership of the life insurance policy.

71.    The Limited Investor Contracts offered and sold by Kent Freeman referred to the amount of each person's investment as a "capital contribution" reflecting a specific "percentage ownership" of the death benefit of a particular life insurance policy and, like the Ten Percent Life Settlement Interests, promised investors that they would be paid a compounded ten percent (10%) rate of return for each year after their initial investment until the maturity of the specified life insurance policy.

72.    However, there was no formed limited liability company that held a life insurance policy interest as an asset.  The Limited Investor Contract was nothing more than a personal debt owed by Kent Freeman.

73.   From August of 2019 until 2024, Kent Freeman offered and sold numerous Limited Investor Contracts to his clients and in return, received in excess of $1.2 million.

74.   Kent Freeman used the proceeds he received in connection with the Limited Investor Contracts to fund his personal lifestyle, pay his taxes, and make interest payments to clients from whom he had previously borrowed money in classic Ponzi scheme fashion. In connection with the offer and sale of the Limited Investor Contracts, Kent Freeman failed to disclose:

a.   that he was substantially indebted to other clients;

b.   that should he be unable to pay the required annual premiums necessary for the specified policy to remain in effect, the Limited Investor Contract investors would likely receive nothing;

c.   that investors had no direct claim to any potential insurance proceeds from the specified policy; and

d.   that investor money was being used to pay previous investors and other obligations and that continually borrowing increasing amounts of money was his only means of keeping his scheme from collapsing.

75.   The Limited Investor Contracts are securities as defined in the Act.

76.   None of the Limited Investor Contracts offered and sold by Kent Freeman were registered as securities at any time under the Act.


B.   **The Unsecured Promissory Notes**

77.   In addition to the Direct Life Settlement Interests, Ten Percent Life Settlement Interests, Premier Promissory Notes, and Limited Investor Contracts, Defendant Kent Freeman

21

further abused the trust and confidence of his clients and borrowed hundreds of thousands of dollars from clients through the issuance of simple written promissory notes and undocumented promises to "invest" the money on behalf of the client.

78.    For example, on July 5, 2024, Investor C.B., who was 88 years old at the time and a client of Kent Freeman for three decades, wrote Kent Freeman a check for Thirty Thousand Dollars ($30,000.00) based on Kent Freeman's verbal representation to "invest" the money for him. This money was part of the last of the remaining assets of Investor C.B. and his wife. As their longtime trusted financial adviser, Kent Freeman was aware of their personal and financial situation. The representation by Kent Freeman that he would "invest" the money for Investor C.B. was false.

79.    Within a few days of Investor C.B.'s check posting to his account, Kent Freeman used the entire amount of Investor C.B.'s money to pay previous Investor P.C. To date, Investor C.B. has received nothing in return for his investment.

80.    The Unsecured Promissory Notes are securities as defined in the Act.

81.    None of the Unsecured Promissory Notes offered and sold by Kent Freeman were registered as securities at any time under the Act.

C.    Sale of Non-Existent Investment

82.    On June 8, 2018, Kent Freeman offered and sold to Investor W.S. an investment that did not exist. Investor W.S. was 81 years old at the time of the investment and had been a client of Kent Freeman for three decades. Kent Freeman described the investment as a "life settlement" investment and provided Investor W.S. with a "Confidential Private Placement Memorandum" (the "PPM") detailing the investment.

22

83.    The PPM, under the heading "The Company and Strategy", and in numerous other places, defined the investment as an "Investor Membership Interest" in the "Ed Ing 2, Deeney, BF Miss., McLean C&B, a Missouri Limited Liability Company (the "Company")". Attached to the PPM and incorporated into it were an operating agreement for the Company (the "Operating Agreement") and a subscription agreement (the "Subscription Agreement") pertaining to the purchase of the investment. The cover page of the Operating Agreement stated "Operating Agreement of Ed Ing 2, Deeney, BF Miss., McLean C&B, LLC" and was signed by Kent Freeman as its managing member. Likewise, the first sentence of the Subscription Agreement defined the investment as a membership interest in the "Ed Ing 2, Deeney, BF Miss., McLean C&B, a Missouri Limited Liability Company (the "Company")" and was signed by Investor W.S. as the purchaser and Kent Freeman as the manager of the Company.

84.    The PPM states that the purpose of the Company is to invest in a group of life insurance policies insuring the lives of six specified individuals identified by surname as "Barran, Ivey, Kitchens, Smith, Tewell and Walters" and referred to in the PPM as the "Insureds". According to the PPM, the proceeds of the investment were to be used by the Company to assure payment of premiums, as due, on the life insurance policies of the Insureds. Kent Freeman advised Investor W.S. that the purchase price of an investment interest in the Company was Fifty-Six Thousand Four Hundred Nineteen Dollars and Eighty Cents ($56,419.80). The Subscription Agreement directs investors to make checks for the purchase price of each investment payable to the Company.

85.    The investment offered and sold to Investor W.S. by Kent Freeman was a fraud. There is no record of the Company having been formed. Knowing that the Company did not

23

exist and contrary to the Subscription Agreement, Kent Freeman directed Investor W.S. to make his check payable to "Kent Freeman" personally.

86.     Kent Freeman deposited Investor W.S.'s check by 10:00 a.m. the following morning into a personal account and, contrary to the representations in the PPM, immediately used the proceeds to pay required annual premiums on three Ten Percent Life Settlement Interests previously sold by him to other investors and to whom he had promised to cover such required premiums using his own money.  Those payments totaled Fifty-Six Thousand Seventy-Seven Dollars and Forty-Four Cents ($56,077.44).  He then used the remainder of Investor W.S.'s funds to pay an unrelated insurance premium of Four Hundred Twelve Dollars and Thirty-Six Cents ($412.36), thereby fully depleting the money entrusted to him by Investor W.S. within three days.

D.     The Ponzi Scheme

87.     In at least 2023, Kent Freeman started operating his own Ponzi scheme.  The premium payment obligations associated with the Ten Percent Life Settlement Interests, the monthly interest payments associated with the Unsecured Promissory Notes along with numerous other payment obligations to his clients had exceeded his net income.

88.     In 2023, Kent Freeman's net business income, after expenses, was less than One Hundred Thousand Dollars ($100,000) but his annual premium payment obligations pursuant to his sales of the Ten Percent Life Settlement Interests were in excess of Two Hundred Ninety-Four Thousand Dollars ($294,000).  His payment obligations to clients, from whom he had borrowed money, exceeded Six Thousand Dollars ($6,000) per month, or in excess of Seventy-Two Thousand Dollars per year ($72,000).  His credit card payments exceeded Twelve Thousand Dollars ($12,000.00) per month.

24

89. To cover these expenses and maintain his lifestyle, Kent Freeman sold additional Limited Investor Contracts, Unsecured Promissory Notes and in certain cases simply asked clients for money to "invest" on their behalf. In connection with this activity, Kent Freeman omitted to state:

    a. that his income was insufficient to cover his current obligations to clients and others;

    b. that under the Limited Investor Contracts, investors held no ownership interest in an underlying life insurance policy and held nothing more than an unsecured claim against Kent Freeman, individually; and

    c. that he was using money from new investors to pay previous investors.

90. For example on July 13, 2023, Freeman solicited and received Seventy-Two Thousand Dollars ($72,000) from Investor C.B. based on the promise to "invest" the money for him. Kent Freeman's representations of "investing" Investor C.B.'s money were false. Within days of receipt of Investor C.B.'s money, Kent Freeman used that money, *not* for investments on behalf of Investor C.B., but as follows:

    a. $13,973 to the U.S. Treasury for federal tax payments;

    b. $5,000 for office rent;

    c. $12,000 to other insurance agents/agencies;

    d. $12,550 in credit card payments;

    e. $19,575 to five previous investors; and

    f. the remainder for various miscellaneous personal expenses and cash withdrawals.

## RELIEF DEFENDANT KAREN FREEMAN

91.     As part of and in connection with the acts practices and course of business described above, Relief Defendant Karen Freeman received proceeds of Defendants' violations of the Act and as such is not entitled to retain those funds and should be ordered to disgorge them.

## FIRST CAUSE OF ACTION

### (Violation of Section 1-301 of the Act: Offer and/or Sale of Unregistered Securities)

92.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 91 above.

93.     The Direct Life Settlement Interests are securities, as defined by Section 1-102 of the Act.

94.     Defendants offered and sold securities in and/or from Oklahoma.

95.     The securities offered and sold by Defendants are not and have not been registered under the Act nor are the securities offered or sold pursuant to an exemption from registration, as required by Section 1-301 of the Act.

96.     By reason of the foregoing, Defendants have violated, are violating, and unless enjoined, will continue to violate Section 1-301 of the Act.

## SECOND CAUSE OF ACTION

### (Violation of Section 1-301 of the Act: Offer and/or Sale of Unregistered Securities)

97.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding cause of action.

98. The Ten Percent Settlement Interests are securities, as defined by Section 1-102 of the Act.

99. Defendants offered and sold securities in and/or from Oklahoma.

100. The securities offered and sold by Defendants are not and have not been registered under the Act nor are the securities offered or sold pursuant to an exemption from registration, as required by Section 1-301 of the Act.

101. By reason of the foregoing, Defendants have violated, are violating, and unless enjoined, will continue to violate Section 1-301 of the Act.

### THIRD CAUSE OF ACTION

**(Violation of Section 1-301 of the Act:
Offer and/or Sale of Unregistered Securities)**

102. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

103. The Limited Investor Contracts are securities, as defined by Section 1-102 of the Act.

104. Defendants offered and sold securities in and/or from Oklahoma.

105. The securities offered and sold by Defendants are not and have not been registered under the Act nor are the securities offered or sold pursuant to an exemption from registration, as required by Section 1-301 of the Act.

106. By reason of the foregoing, Defendants have violated, are violating, and unless enjoined, will continue to violate Section 1-301 of the Act.

## FOURTH CAUSE OF ACTION

### (Violation of Section 1-301 of the Act:
### Offer and/or Sale of Unregistered Securities)

107.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

108.    The Premier Promissory Notes are securities, as defined by Section 1-102 of the Act.

109.    Defendants offered and sold securities in and/or from Oklahoma.

110.    The securities offered and sold by Defendants are not and have not been registered under the Act nor are the securities offered or sold pursuant to an exemption from registration, as required by Section 1-301 of the Act.

111.    By reason of the foregoing, Defendants have violated, are violating, and unless enjoined, will continue to violate Section 1-301 of the Act.


## FIFTH CAUSE OF ACTION

### (Violation of Section 1-301 of the Act:
### Offer and/or Sale of Unregistered Securities)

112.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

113.    The Unsecured Promissory Notes are securities, as defined by Section 1-102 of the Act.

114.    Defendants offered and sold securities in and/or from Oklahoma.

115. The securities offered and sold by Defendants are not and have not been registered under the Act nor are the securities offered or sold pursuant to an exemption from registration, as required by Section 1-301 of the Act.

116. By reason of the foregoing, Defendants have violated, are violating, and unless enjoined, will continue to violate Section 1-301 of the Act.

## SIXTH CAUSE OF ACTION

### (Violation of Section 1-501(2) of the Act: Making an Untrue Statement of Material Fact or Omitting to State a Material Fact)

117. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

118. Defendants, in connection with the offer and/or sale of the securities described above and through the statements described above, have made, and continue to make, untrue statements of material fact or omitted, and continue to omit, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

119. By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-501(2) of the Act.

## SEVENTH CAUSE OF ACTION

### (Violation of Section 1-501(3) of the Act: Engaging in any Act, Practice, or Course of Business that Operates or Would Operate as a Fraud or Deceit upon Another Person)

120. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

121.    Defendants, in connection with the offer and/or sale of the securities described above and through the acts, practices and course of business described above, have engaged, and are engaging, in acts, practices, and a course of business that operate as a fraud upon investors.

122.    By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-501(3) of the Act.

## EIGHTH CAUSE OF ACTION

**(Violation of Section 1-501(3) of the Act:  Engaging in any Act, Practice, or Course of Business that Operates or Would Operate as a Fraud or Deceit upon Another Person)**

123.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

124.    As described in paragraphs 82 through 86 above, Defendants, in connection with the offer and/or sale of the securities described above and through the acts, practices and course of business described above, have engaged, and are engaging, in acts, practices, and a course of business that operate as a fraud upon investors.

125.    By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-501(3) of the Act.

## NINTH CAUSE OF ACTION

**(Violation of Section 1-505 of the Act: Unlawful Statements in a Record)**

126.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

127.    As described in paragraphs 47 through 55 above, Defendants made or caused to be made, in records used in an action or proceeding and/or filed under the Act, statements that, at the time and in the light of the circumstances under which they were made, were materially false or misleading, or, omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not false or misleading.

128.    By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-505 of the Act.

## TENTH CAUSE OF ACTION

**(Violation of Section 1-505 of the Act: Unlawful Statements in a Record)**

129.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

130.    As described in paragraphs 61 through 67 above, Defendants made or caused to be made, in records used in an action or proceeding and/or filed under the Act, statements that, at the time and in the light of the circumstances under which they were made, were materially false or misleading, or, omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not false or misleading.

131.    By reason of the foregoing, Defendants, directly and indirectly, have violated, are violating, and unless enjoined, will continue to violate Section 1-505 of the Act.

## ELEVENTH CAUSE OF ACTION

### (Violation of Rule 660:11-7-42: Dishonest and Unethical Practices of Investment Advisers and Investment Adviser Representatives)

132. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding causes of action.

133. As described in paragraphs 56 through 60 above, Defendant Kent Freeman engaged in dishonest and unethical practices in violation of 660:11-7-42(b)(6) of the Rules while registered under the Act as an Investment Adviser Representative.

## PRAYER FOR RELIEF

Defendants and Relief Defendant have engaged and are engaging in acts and practices in violation of the Act and, as a result of these activities, have received a substantial amount of money from investors.

WHEREFORE, based upon the foregoing, and pursuant to the authority specifically granted by Section 1-603 of the Act, Plaintiff prays for the Court to grant the following relief:

I.

A permanent injunction enjoining Defendants from transacting business in and/or from the state of Oklahoma as an issuer, issuer agent, broker-dealer, broker-dealer agent, investment adviser, and/or investment adviser representative and from otherwise offering and/or selling securities in and/or from the state of Oklahoma;

II.

An order prohibiting Defendants, their agents, servants employees, assigns and all those persons, directly or in directly, acting on their behalf, under their direction and control, and/or in active concert or participation with them, who receive actual notice of the order, by personal service, facsimile or otherwise, and each of them from tampering with, mutilating, altering, erasing, concealing, removing, destroying or otherwise disposing of any and all books, records, documents, files, correspondence, computer disks, tapes or other data recordings of any type, pertaining to or referring to Defendants and any of their subsidiaries or affiliates;

III.

An order prohibiting Defendants, their agents, servants, employees, assigns and all those persons, directly or indirectly, acting on their behalf, under their direction and control, and/or in active concert or participation with them, who receive actual notice of the order, by personal service, facsimile or otherwise, and each of them from, directly or indirectly, transferring, withdrawing, concealing, removing, destroying, or otherwise disposing of any and all assets of the Defendants;

IV.

Restitution to be paid by Defendants;

V.

Disgorgement of all ill-gotten gains obtained by Defendants and Relief Defendant as a result of their violations of the Act and receipt of ill-gotten gains;

VI.

A civil penalty in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) against each Defendant; and/or

## VII.

Such other relief as the Court may deem necessary, just, and proper in connection with the enforcement of the Act.

Respectfully submitted,

OKLAHOMA DEPARTMENT OF SECURITIES
MELANIE HALL, ADMINISTRATOR

By: _____
Patricia A. Labarthe, OBA No. 10391
Shaun M. Mullins, OBA No. 16869
Bradley E. Davenport, OBA No. 18687
Katelyn A. Romeike, OBA No. 36775
Oklahoma Department of Securities
204 North Robinson, Suite 400
Oklahoma City, Oklahoma 73102
Telephone (405) 280-7700
Fax (405) 280-7742
Email: plabarthe@securities.ok.gov
        smullins@securities.ok.gov
        bdavenport@securities.ok.gov
        kromeike@securities.ok.gov
*Attorneys for Plaintiff*

34